**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**Bernard Jay COVEN, Defendant-Appellant.**

**No. 558, Docket 75–6080.**

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1978.

Decided June 2, 1978.

Bernard Jay Coven, P.C., New York City, for defendant-appellant.

David Ferber, Sol. to the Commission, and Glynn L. Mays, Atty. S. E. C., Washington, D.C. (Sue E. Auerbach, Atty., S. E. C., Washington, D.C., of counsel), for plaintiff-appellee.

Before MOORE, SMITH and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

On July 5, 1973, the SEC commenced this action for injunctive relief pursuant to 15 U.S.C. §§ 77t(b) and 78u against 11 persons, including appellant, Carlton-Cambridge & Co. ("Carlton"), its president, Joseph Rega, Jr., and the Republic National Bank of New York ("Bank"), charging numerous violations of the federal securities laws in connection with a public offering of the common stock of Dennison Personnel, Inc. in 1972 and the subsequent manipulation of its market price.[1] Appellant allegedly participated in several of these violations. His conduct in each instance was claimed to violate § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a).

After a non-jury trial Judge Pierce filed an opinion recording his findings and conclusions of law on June 30, 1975. Appellant was held liable as an aider and abettor of three violations: (1) the improper closing of the "all-or-none" portion of the Dennison issue in violation of SEC Rule 10b–9, (2) the underwriters' failure to comply with their obligation to use "best efforts" to sell the entire offering, violating Rule 10b–5 and § 17(a) of the 1933 Act, and (3) Carlton's improper trading in Dennison stock undertaken while it was participating in its distribution, which violated Rule 10b–6. Judge Pierce concluded that an injunction was the appropriate remedy. In a second opinion responding to appellant's motion for reconsideration, Judge Pierce declined to alter his conclusions concerning appellant's liability and the propriety of an injunction. Consequently, he entered an order enjoining appellant from committing future violations of the sort he was found to have aided and abetted.

For reasons set out below, we affirm the lower court's order with regard to one of the violations attributed to appellant—the improper closing of the escrow account—on the ground that his conduct amounted to aiding and abetting of violations of § 17(a) of the 1933 Act. However, we reverse as to the other two violations—Carlton's improper trading and the underwriters' noncompliance with their obligation to use "best efforts"—on the ground that appellant's part in these violations did not rise to the level of aiding and abetting.

Appellant is an attorney specializing in corporate law, including securities law, with more than 20 years experience. In June 1971, he was retained by Gerald Bowes, president of Dennison, as special counsel for the purpose of effecting a public offering of Dennison's securities and was given complete responsibility for preparing the issue. In connection with this agreement, appellant thereafter undertook to locate underwriters, to draft necessary documents and to render legal opinions regarding the proposed issue.

These efforts resulted in a public offering in 1972 of 6,000,000 shares at a price of $.10 per share. The underwriters were Carlton and another broker-dealer, Stevens Jackson

---

1. The complaint which covered 21 pages, alleged myriad violations of §§ 5(b) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§ 77e(b) and 77q(a), §§ 10(b) and 15(c)(2) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2) (1970), and Rule 10b–5, 10b–6, 10b–9, and 15c2–4, promulgated thereunder.

Seggos, Inc. ("Stevens Jackson"). According to the registration statement for the issue, which the SEC declared effective on April 26, 1972, the underwriters were to use their "best efforts"[2] to sell the entire offering in 60 days, subject to a possible 30-day extension upon agreement of Dennison and the underwriters. The first 3,000,000 shares were to be sold on an "all-or-none" basis, i. e., if this number should not be sold in the required time, all funds obtained from buyers were to be refunded in full.

Because a refund might become necessary, appellant drafted an escrow agreement—which was made an exhibit to the registration statement and described in the prospectus. It required the underwriters, Carlton and Stevens Jackson, to deposit with the escrow agent, the Bank, "all funds . . . which the Underwriters have received for the purchase of shares of the Stock accompanied by appropriate Letters of Transmittal listing the names and addresses of the purchasers of the Stock and the number of shares purchased by each" within three business days of their receipt. It further provided that the underwriters would set a "Delivery Date" if 3,000,000 shares were sold, at which time the Bank would "deliver to [Dennison] and to the Underwriters, its checks in the amount of $255,000 and $45,000 [the underwriters' commissions on sales of the minimum portion], respectively, *provided that collected funds sufficient to cover such payments shall be in the Escrow Account on the Delivery Date.*" (Emphasis added). Consistent with the foregoing, the agreement explicitly stated that the proceeds of the offering were to be returned to the buyers in full "[i]n the event that there shall not be $300,000 in the Escrow Account on the Delivery Date. . . ."

Unfortunately, from the outset Rega and Carlton failed to observe the terms of the offering and took steps to limit sales of Dennison stock in order to enhance their ability to manipulate its price in transactions with their customers. For the purposes of this appeal, we need consider only those three aspects of this scheme that appellant was held to have aided and abetted.

### 1. *Closing of the "All-or-None" Portion of the Offering*

The escrow agreement contained several provisions designed to assure that purchasers' money would be segregated until it could be definitely determined that 3,000,000 shares of Dennison had been sold. All receipts from sales of the shares were to be deposited immediately, the Bank was to receive detailed lists of purchasers and the quantities of their purchases, and no disbursements were to be made until the account contained $300,000. Unfortunately, as Judge Pierce put it, "this rather simple procedure was not followed."

At the outset, the underwriters were lax in remitting receipts and lists of purchasers to the Bank. Moreover, appellant took the position, despite the express contrary terms of the agreement he had drafted, that the underwriters might deposit funds "net"—i. e., after deducting their commissions. Obviously, these breaches complicated the task of determining how many shares had been sold at any given time.

The parties also deviated from the terms of the escrow agreement by moving to close the "all-or-none" portion of the offering without first taking care to assure that 3,000,000 shares had been sold. Such a closing was first scheduled for May 30, despite the fact that the escrow account contained only some $65,000 at the time. This date passed without a closing, but new attempts were scheduled for June 5 and then June 12. At no time did the account contain as much as $300,000.

On June 12, the parties gathered at the Bank. The account then stood at $231,003, $7,506.25 of which represented a deposit

**2.** In a "best efforts" underwriting, the underwriter undertakes to sell the offering to the public but assumes no responsibility for any shares not sold. Such an arrangement may be contrasted to a "firm commitment" underwriting, in which the underwriter assumes the risk of loss on the unsold portion of the distribution. Jennings & Marsh, Securities Regulation 75 (3d ed. 1972).

made by Stevens Jackson, one of the two underwriters, earlier that day. Rega brought with him to this attempted closing a check for $31,493.75 drawn on Carlton's account. Added to the balance in the account, it boosted the balance in the Bank's possession to $262,496.75, less than $300,000 but more than the $255,000 owed to Dennison on sales of the all-or-none portion of the offering. Because appellant had taken the position that the underwriters were entitled to remit funds "net" and that the critical prerequisite to a closing was the presence in the account of sufficient funds to pay Dennison its share of the proceeds of the first 3,000,000 sales, some of those present at the meeting apparently pressed for an immediate closing. However, the Bank refused to disburse any funds until after Rega's $31,000 check had cleared. Moreover, the meeting degenerated into a heated argument over whether the "all-or-none" portion of the offering could legitimately be closed before the escrow account contained $300,000 and without a guarantee that 3,000,000 shares had been sold. Judge Pierce found that no one at this gathering had any clear idea of how many shares had actually been sold. The parties dispersed after the Bank made it clear that it wanted assurances that the "all-or-none" portion of the offering had been sold and that the underwriters had in fact deposited receipts "net" in accordance with appellant's position.

On the following day, June 13, appellant drafted a letter pursuant to the Bank's request representing that 3,075,000 shares had been sold, 351,000 of which were attributed to Stevens Jackson [3] and the remainder to Carlton. Judge Pierce held that appellant had no informed basis for his categorical statement, and none appears in the record.[4] Indeed, the figure soon proved wrong; only 3,073,500 shares were requisitioned from the stock transfer agent and delivered to the Bank on June 19.

After appellant had written his letter to the Bank containing the 3,075,000 figure, Carlton ordered 2,724,000 shares from the transfer agent; the record reveals no previous *specific* statement as to the volume of its sales. Of the shares ordered, 1,000,145 were requisitioned in Carlton's own name ("street name"). The lower court found that a large number of shares did not actually correspond to sales to customers of Carlton, concluding that Carlton had simply subtracted the number of shares claimed to have been sold by Stevens Jackson from the 3,075,000 figure supplied by appellant. In this way Carlton arrived at the figure it was supposed to have sold. It supplied the difference between this figure and its actual sales by subscribing for the difference in "street name" shares.[5] Accordingly, Judge Pierce concluded that the underwriters had never actually sold 3,000,000 shares.

Nevertheless, on June 20 and 27, the Bank disbursed all of the funds in the escrow account, paying part to itself for its fee, part to Stevens Jackson for unpaid commissions, and the balance to Dennison, the issuer, as its proceeds from the offering. The Bank's conclusion that 3,000,000 shares had been sold was based on its count of the certificates received from the transfer agent, the unsupported representation in appellant's letter of June 13 and communications from the underwriters assuring it

---

3. The 351,000-share figure matched a representation in a letter written by Stevens Jackson to the Bank on June 13.

4. Judge Pierce hypothesized that appellant had assumed all along that the minimum closing scheduled for June 12 would cover exactly 3,000,000 shares and merely added 75,000 shares corresponding to Stevens Jackson's deposit of roughly $7,500 on June 12 without ever verifying any actual sales. Appellant mounts a vigorous attack on this suggestion. However, this dispute is peripheral, since appellant has failed to offer any valid affirmative basis for his

categorical assurance that 3,075,000 shares had been sold. Whether or not the representation was based on the computation hypothesized by the lower court, it was not based on a reasonable investigation.

5. All of Carlton's records concerning specific transactions that preceded that closing of the "all-or-none" portion of the offering were allegedly transferred to New Jersey, damaged in a flood, and then destroyed prior to the trial of this action.

that the shortfall in the escrow account was due to their practice of remitting funds "net."

### 2. Carlton's Trading During its Participation in the Distribution

Even before the closing of the minimum portion of the offering, Rega began taking steps to manipulate the price of Dennison shares. On June 1 and 2, he misled a trader at M.S. Wien, a trading house, by informing him that the Dennison issue would be closed as of June 2 and thus open for normal trading on that date. Consequently, M.S. Wien submitted a listing application to the National Quotation Bureau for inclusion in its "pink sheets."[6] The listing, which appeared in the sheets distributed to brokers on June 5, indicated the firm's intention to make a market in the stock by buying and selling its shares.

On June 5, M.S. Wien received a purchase order for 37,000 shares from K.F.M. Securities, which it filled at a price of $.145 a share, thereby taking a short position in the stock. Thirty-five thousand of the shares ordered by K.F.M. represented an order placed by a Carlton employee, Ross Pascall, with K.F.M. Thus, the effect of Rega's misrepresentations to M.S. Wien and Pascall's order was to create the impression of a public market in Dennison stock at a price above the $.10 offering price at which Carlton was supposed to be making sales to the public.

Judge Pierce credited the testimony of a trader at Stevens Jackson, one Lian, to the effect that appellant, prior to the entry of Dennison in the pink sheets, had notice of M.S. Wien's intention to make a market in Dennison stock. The firm's listing was also

called to appellant's attention on a couple of subsequent occasions. However, he did not investigate the circumstances surrounding M.S. Wien's action. He contends now that he assumed that M.S. Wien would be trading on a "when, if, and as issued" basis[7] and saw no need for any inquiry. In this respect his initial response was somewhat similar to that of Steven Glusband, an SEC investigator responsible for monitoring the Dennison offering, who testified that the appearance of M.S. Wien in the pink sheets in and of itself did not establish a violation of the securities laws. However, after a short period of inaction Glusband did initiate an inquiry into M.S. Wien's activities by calling that firm and others.

### 3. The Failure to Use Best Efforts

Judge Pierce found that Carlton made only a limited attempt to sell the Dennison offering, despite the requirement of its contract with the issuer and its representation in the registration statement that it would use its "best efforts" to dispose of all 6,000,-000 shares. Indeed, Carlton ceased soliciting sales of Dennison at the $.10 offering price secretly on May 29, only a little more than a month after the registration statement had become effective and well before the end of the minimum 60-day selling period.

Appellant was in frequent contact with Carlton both before the June 12 meeting at the Bank and thereafter. However, by his own account, he made no effort to inquire into its efforts to sell the maximum portion of the offering. His explanation at trial was that other matters had kept him too busy to monitor the success of the entire issue.

---

**6.** The "pink sheets" describe a publication sent to broker-dealers which lists the prices at which dealers are willing to buy and sell over-the-counter stocks.

**7.** Most trading is conducted on the basis of "regular way contracts" which require settlement and delivery of the certificates no later than the fifth business day after the transaction. "When, as and if issued" trading refers to transactions in shares that have not been formally issued, and, accordingly, settlement is

contingent on later issuance of the stock. CCH NASD Manual § 4, ' 3504.10.

On June 5, when M.S. Wien's listing in the pink sheets first appeared, the formal closing of the "all-or-none" portion of the issue was still more than two weeks off, so regular way trading was not proper. Nevertheless, testimony at trial indicated that M.S. Wien, having been misled by Rega, intended to trade on a regular basis from the outset.

Eventually, the facts of Carlton's improper trading [8] and its failure to use their "best efforts" came to light. On July 11, an amendment to the registration statement deregistering the offering was filed.

In assessing appellant's responsibility for these improper activities, Judge Pierce applied a standard derived from *SEC v. Spectrum Ltd.*, 489 F.2d 535, 541 (2d Cir. 1973), and *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 811 (2d Cir. 1975), cases in which we stated that liability for aiding and abetting could be based on negligent conduct when the defendant "should have been able to conclude that his act was likely to be used in furtherance of illegal activity." 515 F.2d at 811. The district court concluded that appellant's acts and failures to investigate were negligent and assisted those primarily responsible for the improper closing of the escrow account, improper trading in Dennison shares by Carlton and those connected with it, and Carlton's failure to use best efforts. Accordingly, the lower court held appellant liable as an aider and abettor of each of these violations.

## DISCUSSION

■ Appellant's principal contention is that Judge Pierce applied an incorrect legal standard in determining his liability as an aider and abettor. Citing the Supreme Court's holding in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that "scienter"—i. e., an "intent to deceive, manipulate, or defraud" —must be shown in a private action for damages based on Rule 10b–5, he maintains that he should not have been judged under a negligence standard in this SEC enforcement action for injunctive relief. This calls upon us to determine the standard of liability to be applied in the present case.

In determining the applicable standard, we are governed by several basic principles. First of these is the concept, several times reiterated by the Supreme Court, that the federal securities acts embody liberal notions of fraud and deceit, *SEC v. Capital*

*Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 200, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), and that they should be flexibly construed in order to give effect to their broad purposes, *Capital Gains Research Bureau, supra*, 375 U.S. at 195, 84 S.Ct. 275; *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *J. I. Case v. Borak*, 377 U.S. 426, 432–33, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Secondly, as the Court pointed out in *Hochfelder*, since Congress has specified differing standards of liability in different sections of the federal securities laws, which vary according to the specific remedial purpose to be served by each section, "[a]scertainment of congressional intent with respect to the standard of liability created by a particular section of the Acts must therefore rest primarily on the language of that section," 425 U.S. at 200, 96 S.Ct. at 1384. Lastly, as we recently held in *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–48 (2d Cir. 1978), a reckless disregard for the truth or falsity of a material statement, as distinguished from mere negligence, may constitute scienter or the legal equivalent of knowledge. *See United States v. Benjamin*, 328 F.2d 854, 862–63 (2d Cir. 1964), *cert. denied sub nom. Howard v. United States*, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964).

In *Hochfelder* the sole claim at issue was whether an accounting firm could be held liable in a private action for damages under § 10(b) of the 1934 Act and Rule 10b–5, in the absence of any allegation of scienter, i. e., on the basis of its negligence in failing to conduct proper audits of a firm alleged to have defrauded the plaintiffs. The Supreme Court, in holding that allegation and proof of scienter was essential, based its decision on the legislative history and language of § 10(b), which makes it unlawful for any person to use or employ, in connection with the purchase or sale of a security,

---

8. On June 15 Carlton entered a listing in the pink sheets under its own name.

"any manipulative or deceptive device or contrivance" in contravention of such rules and regulations as the Commission may prescribe. Rule 10b–5, promulgated by the Commission purportedly pursuant to its power under § 10(b), proscribed without mention of scienter the use in interstate commerce of "(b) . . . any untrue statement of a material fact or [omission of] a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." The Court concluded that the statute's words "manipulative or deceptive," when used in conjunction with "device or contrivance" and viewed in the light of the statute's legislative history, "connote intentional misconduct." 425 U.S. at 197, 96 S.Ct. 1375. It further concluded that, although the broader language of Rule 10b–5 could encompass negligent behavior, "its scope cannot exceed the power granted the Commission by Congress under § 10(b)." 425 U.S. at 214, 96 S.Ct. at 1391.[9] Applying these principles here, the present case differs from *Hochfelder* in at least one important respect.[10] Here the SEC charged appellant not only with a violation of § 10(b) of the 1934 Act but also with violation of § 17(a) of the 1933 Act, the language of which is significantly different from that of § 10(b). Section 17(a) provides:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

This wording is virtually identical to that of Rule 10b–5, which the Supreme Court suggested in *Hochfelder* would subject wrongdoers to liability for negligence were it not for the fact that the rule can be no broader than the statute under which the rule was promulgated. 425 U.S. at 212, 96 S.Ct. 1375. As the Court stated, the language of subsection (2) of § 17(a) gives no indication that liability is predicated on fraudulent intent. *Id.* Moreover, the clear import of the critical phrase in subsection (3), "operates as a fraud," is to focus attention on the *effect* of potentially misleading conduct on the public, not on the culpability of the person responsible.[11] Absent any terminology in § 17(a) comparable to "manipulative or deceptive device or contrivance" in § 10(b), upon which the Supreme Court relied heavily in *Hochfelder*, we see no rea-

---

**9.** The Court stated, "Viewed in isolation the language of subsection (b), and arguably that of subsection (c), could be read as proscribing, respectively, any type of material misstatement or omission, and any course of conduct, that has the effect of defrauding investors, whether the wrongdoing was intentional or not." 425 U.S. at 212, 96 S.Ct. at 1390.

**10.** We have not yet resolved the question, left open in *Hochfelder*, of whether "scienter" is required in suits brought by the SEC for injunctive relief based on § 10(b) or Rule 10b–5. See *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8, 14 (2d Cir. 1977); *SEC v. Commonwealth Chemical Securities, Inc.*, No. 76–6175, 574 F.2d 90 at 100–102 (2d Cir. 1978). We need not reach it in this case.

**11.** Because of the use of the term "fraud," some have viewed this phrase as entailing a requirement of intent. E. g., *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 795 (7th Cir. 1977); 3 Loss, Securities Regulation 1441–42 (2d ed. 1961), as supplemented, 6 Loss, Securities Regulation 3552–53 (Supp.1969). However, we believe that the phrase read as a whole was intended to expand common law notions of the elements of fraud. Cf. *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963) (discussing Investment Advisers Act of 1940, "Congress in empowering the courts to enjoin any practice which operates 'as a fraud or deceit' upon a client, did not intend to require proof of intent to injure . . . .").

son to give § 17(a) a similarly narrow reading.[12]

Our reading of the language of § 17(a) is in accord with its legislative history. When legislation to regulate the selling of securities to the public was being considered by both Houses of the Congress in 1933, the Senate passed a bill that included the following provision:

"Sec. 13. It shall be unlawful for any person, firm, corporation, or other entity, directly or indirectly, in any interstate sale, promotion, negotiation, advertisement, or distribution of any securities *willfully* to employ any device, scheme, or artifice or to employ any 'dummy', or to act as any such 'dummy', *with the intent to defraud* or to obtain money or property by means of any false pretense, representation, or promise, or *to engage in any transaction, practice, or course of business relating to the interstate purchase or sale of any securities which operates or would operate as a fraud upon the purchaser. . . .*" (Emphasis added).[13]

However, the House version of the legislation contained no such requirements of willfulness or "intent to defraud." Its approach was ultimately adopted by the Conference Committee.

Congress thus opted for liability without willfulness, intent to defraud, or the like, in enacting § 17(a). Indeed, William O. Douglas, who was soon to head the SEC and later to become a Justice of the Supreme Court, wrote contemporaneously that § 17 makes unlawful "even innocent acts to obtain money or property by means of untrue statements of material facts or omissions to state material facts." Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 181 (1933) (footnote omitted).

Finally, nothing in the structure of the remedies provided in the securities acts suggests that an intent to deceive, defraud or manipulate is implicit in § 17(a) when it serves as the basis for an SEC enforcement action. Some courts have noted that if a private action for damages were recognized under § 17(a), and if scienter were not required, the effect might well be to negate limitations on private recoveries for negligence contained in §§ 11, 12(2) and 15 of the 1933 Act, 15 U.S.C. §§ 77k, 77*l*(2), and 77*o*.[14] Even assuming this to be so,[15] it could not properly provide a basis for limiting the liability Congress apparently intended to create with regard to SEC enforcement proceedings.

■ Impressive policies support an interpretation of § 17(a) enabling the SEC to seek injunctive relief on the basis of negligent conduct. The essential nature of an SEC enforcement action is equitable and prophylactic; its primary purpose is to protect the public against harm, not to punish

---

**12.** Since *Hochfelder* other courts have divided on the question of whether the holding in that case should be extended to suits brought under § 17(a). Compare *SEC v. Geotek*, 426 F.Supp. 715, 726 (N.D.Cal.1976); *SEC v. Shiell* [1977–78 Transfer Binder], Fed.L.Sec.Rep. (CCH) ¶ 96,190 (N.D.Fla.1977); *SEC v. Southwest Coal & Energy Co.*, 439 F.Supp. 820, 826 (W.D. La.1977); *SEC v. World Radio Mission*, 544 F.2d 535, 541 n. 10 (1st Cir. 1976) (no intent to deceive, defraud or manipulate required under § 17(a)), with *SEC v. American Realty Trust Co.*, 429 F.Supp. 1148, 1171 (E.D.Va.1977); *SEC v. Cenco Inc.*, 436 F.Supp. 193, 199–200 (N.D.Ill.1977) (scienter required). See also *Collins Securities Corp. v. SEC*, 183 U.S.App.D.C. 301, 562 F.2d 820 (1977) (not reaching the issue).

**13.** This provision was introduced on the floor of the Senate as § 13 of S. 875 (73d Cong., 1st Sess.).

**14.** E. g., *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 795–96 (7 Cir. 1977); *Malik v. Universal Resources Corp.*, 425 F.Supp. 350, 363–64 (S.D.Cal.1976). See 3 Loss, Securities Regulation 1784–87 (2d ed. 1961), as supplemented, 6 Loss, Securities Regulation 3912–15 (Supp.1969).

**15.** The questions of whether such an implied private right of action for damages exists under § 17(a) and what its elements may be apparently remain open. See *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734 n. 6, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 783, 787 (2d Cir. 1951) (dicta); *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 867 (2d Cir. 1968) (Friendly, J., concurring), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

the offender. E.g., *Capital Gaines Research Bureau, supra,* 375 U.S. at 193, 200, 84 S.Ct. 275. This purpose is furthered by an interpretation of § 17(a) which enables the SEC to move against negligent conduct whose effects on the public may be every bit as detrimental as those produced by intentional misconduct.

Inasmuch as those responsible as principals for violations of § 17(a) may be liable for negligent misconduct in the context of SEC enforcement actions, we see no reason why scienter of the sort required in *Hochfelder* should be a necessary element of aiding and abetting. Rather, we adhere to the flexible standard we articulated in *SEC v. Management Dynamics, Inc., supra.* The test is whether an alleged aider and abettor "should have been able to conclude that his act was likely to be used in furtherance of illegal activity," in light of all of the circumstances, 515 F.2d at 811, including the nature of the defendant's assistance to the primary wrongdoer, his participation in the challenged conduct, his awareness of the illegal scheme, and any duties to investigate or supervise that may be applicable. As we recognized in *SEC v. Spectrum, Ltd., supra,* this flexible standard may sometimes impose stringent obligations upon attorneys whose actions facilitate wrongdoing. We stated there:

> "We do not believe, moreover, that imposition of a negligence standard with respect to the conduct of a secondary participant [an attorney] is overly strict, at least in the context of this case. The legal profession plays a unique and pivotal role in the effective implementation of the securities laws. Questions of compliance with the intricate provisions of these statutes are ever present and the smooth functioning of the securities markets will be seriously disturbed if the public cannot

rely on the expertise proffered by an attorney when he renders an opinion on such matters." 489 F.2d at 541–42.

Accordingly, in assessing appellant's conduct on the basis of principles developed in *Spectrum* and *Management Dynamics,* Judge Pierce was applying standards appropriate to § 17(a). Moreover, if appellant acted with reckless disregard for the truth or falsity of material misrepresentations made by him, his conduct would also violate § 10(b) of the 1934 Act, according to the interpretation of that section adopted by us in *Rolf v. Blyth, Eastman Dillon & Co., supra.* We turn, therefore, to the question of whether application of these standards to the present case would require any change in the conclusions reached by the district court.

 With regard to the closing of the minimum "all-or-none" portion of the issue, appellant's misconduct clearly aided and abetted a violation of § 17(a). The failure to comply with the terms of the escrow agreement and the closing prior to the bona fide sale of 3,000,000 shares [16] plainly "operated as a fraud" upon the public. The lower court's finding that 3,000,000 shares had not been sold in genuine transactions was not clearly erroneous. On the contrary, it is supported by ample evidence, including the non-existence of $300,000 in the escrow account, Carlton's order for the exact number of "street name" shares required to match the difference between Stevens Jackson's claimed sales of 351,000 shares and the figure of 3,075,000 shares apparently picked by appellant out of the air, and the mysterious destruction of the records of Carlton's sales. Even if the underwriting agreement provided that Carlton might purchase Dennison shares for its own account (for resale to the public at the

---

**16.** See *SEC v. Commonwealth Chemical Securities, Inc.,* No. 76–6175, 574 F.2d at 97 (2d Cir. 1978); Securities Exchange Act Release No. 11532, July 11, 1975, 2 Fed. Sec. L. Rep. (CCH) ¶ 22,730 (July 29, 1975):

> "[U]nder Rule 10b–9, an offering may not be considered 'sold' for the purposes of the representation 'all or none' unless all the securities required to be placed are sold in *bona*

*fide* transactions and are *fully paid for.* It is clearly contrary to the intent and purpose of the rule to declare an offering all sold, for the purposes of the 'all or none' conditions . . on the basis of non-bona fide sales designed to create the appearance of a successful completion of the offering, such as purchases by the issuer through nominee accounts." (Emphasis added).

offering price), ¶ 3(f); 697a, it obviously did not contemplate that the underwriter would be able to make purchases at less than the offering price by depositing funds net of commissions in the escrow account. *SEC v. Commonwealth Chemical Securities, Inc.,* No. 76–6175, 574 F.2d at 97 (2d Cir. 1978).[17] Accordingly, it is not a defense, as appellant suggests, that Dennison itself received funds corresponding to the amount it would have received net from sale of 3,000,000 shares or that certificates representing 3,073,500 shares were issued.

Appellant's own suggestion that the underwriters could deposit receipts net of commissions in the escrow account, moreover, destroyed the simple means devised by the parties for determining whether 3,000,-000 shares had in fact been sold and jeopardized the purchasers' right to receive a full refund in the event that the minimum portion of the offering should be unsuccessful. After the June 12 meeting, which clearly put appellant on notice that a question existed as to whether 3,000,000 shares had been sold, he promptly wrote a letter falsely stating that 3,075,000 shares had been purchased without having any basis for this representation. This action not only was negligent for purposes of § 17(a), but also amounted to the kind of "reckless disregard" we have recently held sufficient to support a finding of scienter in a private damage action under § 10(b) of the 1934 Act. *Rolf v. Blyth, Eastman Dillon & Co., supra,* 570 F.2d at 44–47. Since this letter was prepared at the request of the Bank in order to assure that the minimum portion of the offering would not be closed improperly prior to sales of a sufficient number of shares, appellant clearly "should have been able to conclude" that his letter was "likely to be used in furtherance of illegal activity." In this respect, appellant's conduct is substantially the same as that of the attorney in *Spectrum, supra,* who prepared an opinion letter incorrectly stating that unregistered stock could be traded, which was then used to facilitate illegal sales of the stock. In short, appellant not only failed to take even the first step to guarantee compliance with the terms of the escrow agreement and registration statement that he had drafted, but also assisted Rega and Carlton in obtaining a closing of the minimum portion of the offering on the basis of sales that were not bona fide. Under the circumstances, he cannot now claim that he would have been unable to uncover Carlton's wrongdoing even if he had tried.

Appellant's liability for Carlton's improper trading activity and for the underwriters' failure to use their "best efforts" to sell the maximum portion of the Dennison offering is more troublesome. His participation in these matters was limited to a failure to investigate and disclose the underwriters' activities to the public, to Dennison, or presumably to the SEC. Although the circumstances may well have prompted a reasonable person to investigate, we cannot conclude that appellant should have known that his failure "was likely to be used in furtherance of illegal activity." Under the circumstances, therefore, the

---

**17.** Rule 15c2–4, 17 C.F.R. § 240.15c2–4, which was promulgated pursuant to authority granted in § 15(c)(2) of the 1934 Act is instructive. It provides in part:

"It shall constitute a 'fraudulent, deceptive, or manipulative act or practice' as used in section 15(c)(2) of the Act, for any broker, dealer or municipal securities dealer participating in any distribution of securities, other than a firm-commitment underwriting, to accept any part of the sale price of any security being distributed unless:

\* \* \* \* \* \*

"(b) If the distribution is being made on an 'all-or-none' basis, or on any other basis which contemplates that payment is not to be made to the person on whose behalf the distribution is being made until some further event or contingency occurs, (1) the money or other consideration received is promptly deposited in a separate bank account, as agent or trustee for the persons who have the beneficial interests therein, until the appropriate event or contingency has occurred, and then the funds are promptly transmitted or returned to the persons entitled thereto, or (2) all such funds are promptly transmitted to a bank which has agreed in writing to hold all such funds in escrow for the persons who have the beneficial interests therein and to transmit or return such funds directly to the persons entitled thereto when the appropriate event or contingency has occurred."

lower court's findings are insufficient, under the *Management Dynamics* standard, to hold appellant liable for aiding and abetting the failure to use best efforts and Carlton's improper trading.

With regard to appellant's failure to investigate the appearance of M.S. Wien in the pink sheets, there can be no doubt that Rega, Carlton's president, and Pascall, its employee, violated Rule 10b–6 and § 17(a). Rega's misleading statements induced M.S. Wien to begin trading in Dennison, and Pascall placed an order, later reflected in the pink sheets, that created a false indication of public interest in the stock. Nevertheless, as the SEC's investigator testified, the appearance of M.S. Wien in the pink sheets—a circumstance of which appellant had prior notice—was not in itself indicative of illegality, since it was consistent with trading on an "if, as and when issued" basis. Although, as the SEC points out, even this kind of trading may be deceptive if induced by an underwriter, the lower court did not find that appellant was aware of Carlton's role in M.S. Wien's activities. Absent some concrete indication of knowledge by appellant that an underwriter was engaged in wrongful trading, we do not think that as attorney for the issuer he was under an obligation to investigate trading in the issuer's securities to determine whether an underwriter was so engaged. Accordingly, under the circumstances of this case, we conclude that appellant's failure to investigate M.S. Wien's market-making role did not aid and abet the unlawful trading that took place through that firm.

Likewise we hold that appellant's failure to uncover the underwriters' failure to use "best efforts" did not constitute aiding and abetting of a violation of the securities laws. We may assume *arguendo* that the underwriters' conduct "operated as a fraud" on the public and thereby violated § 17(a). Obviously, it was important to the public that the underwriters comply with this part of their contract with Dennison, which was incorporated in Dennison's registration statement, since the company's future prospects and the nature of the market for subscribers' shares were dependent on the volume of the underwriters' sales. However, although the lower court found that after June 12 appellant took no action to monitor the progress of the underwriters' effort to sell the maximum portion of the offering, it was not shown that appellant actually knew that Carlton had secretly stopped selling at an early point in the offering, or that he had any stake in limiting the public distribution, as did Carlton. While we think that appellant showed bad judgment in failing to make the minimal inquiries of the underwriters' attorney— particularly in view of the confusion surrounding sales of the minimum portion—we cannot conclude that he "should have known" that his inaction would further illegal activity. The full scope of Carlton's failure to comply with the terms of its undertaking to attempt to sell Dennison's shares was not revealed, according to Judge Pierce's findings, until shortly before the deregistration of the issue, and even the turmoil surrounding the closing of the minimum portion of the offering did not furnish the basis for an assumption that Carlton had undertaken to subvert completely the legitimate goals of the issue. Under the circumstances, we do not find a sufficient factual basis for the conclusion that appellant aided and abetted the underwriters' misconduct.

Because the lower court erred in holding that appellant aided and abetted Carlton's improper trading and the failure to use best efforts to sell the maximum portion of the issue, those portions of its final order enjoining appellant from committing future violations of the same kind must be reversed. *SEC v. Commonwealth Chemical Securities, Inc.*, No. 76–6175, 574 F.2d at 100 (2d Cir. 1978); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972).[18]

18. Appellant has also maintained that injunctive relief should not have been granted against him because of an insufficient showing of a

likelihood of future violations. Although the lower court's first opinion improperly stated that appellant had the "burden" of showing

In all other respects we affirm the judgment of the lower court.

that his past violations would not be repeated, see *SCM Corp. v. FTC*, 565 F.2d 807, 812–13 (2d Cir. 1977), his second opinion canvassed the relevant factors bearing on the possibility of future violations without regard to the burden of proof. He was well within his discretion in enjoining appellant from committing future violations of the same sort in which he participated during the Dennison offering. *See SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d at 1100–03.