618 P.2d 609

**The STATE of Arizona, Appellee,**

v.

**Robert Harlan GUNNISON, Jr., Appellant.**

**No. 2 CA–CR 1700.**

Court of Appeals of Arizona, Division 2.

Oct. 24, 1979.

Rehearing Denied Dec. 3, 1979.

Review Granted Jan. 3, 1980.

Stephen D. Neely, Pima County Atty., by Alan D. Davidon, Deputy County Atty., Tucson, for appellee.

Jack L. Lansdale, Jr., Tucson, for appellant.

## OPINION

HOWARD, Judge.

Appellant was convicted by the court sitting without a jury of Count One, conspiring to violate Article 18 of Chapter 12 of Title 44 of the Arizona Revised Statutes and A.R.S. Sec. 44–1991; Count two, fraud in the purchase or sale of securities (Birenbaum Transaction) in violation of A.R.S. Secs. 44–1991 and 44–2036(A); Count 23, fraud in the purchase or sale of securities (Nuel Transaction) in violation of Secs. 44–1991 and 44–2036(A); Count 166, failure to post a real property securities dealer's bond in violation of A.R.S. Secs. 44–2066.06 and 44–2036(A), as amended and Count 167, failure to file a real property securities dealer's annual report in violation of Secs. 44–2066.07 and 44–2036(A), as amended. He was sentenced to concurrent prison terms of from 1 to 3 years on each count.

We have been presented with several questions for review. Issues 6, 7, 8, 9, 10 and 11 have been answered adversely to appellant in *State v. O'Brien*, 123 Ariz. 578, 601 P.2d 341 (1979) and will not be further discussed.

Appellant was the president of Arizona Realty and Mortgage Trust (AR&MT) and Thomas O'Brien was the president of Equitable Mortgage Company (Equitable). AR&MT assigned notes and mortgages to Equitable which were then sold by Equitable to members of the public. Neither Equitable, AR&MT, O'Brien nor appellant complied with Title 44, Article 18, Chapter 12 of the Arizona Revised Statutes (A.R.S. Secs. 44–2066 et seq.) which require, inter alia, a real property securities dealer's bond (A.R.S. Sec. 44–2066.06) and a real property securities permit (A.R.S. Sec. 44–2066.08). Other facts will be set forth as they relate to specific issues raised by appellant.

1. This case was decided on March 23, 1979.

Both appellant and O'Brien were indicted by a grant jury. O'Brien's jury trial was held prior to appellant's trial. The parties stipulated, inter alia, that the trial court, in its decision here, would be governed by the legal principles set forth in the jury instructions given in the O'Brien trial.

## CRIMINAL INTENT UNDER A.R.S. § 44–1991(2)

In the O'Brien case, the trial court instructed the jury that under Counts 1, 2 and 23, in order to find a violation of A.R.S. Sec. 44–1991(2), it was only necessary to find that the defendant acted willfully. Appellant contends that the instruction was erroneous and that he cannot be convicted unless the state proves a specific intent to defraud. We do not agree.

In *Greenfield v. Cheek*, 122 Ariz. 57, 593 P.2d 280 (1979)[1] the Arizona Supreme Court approved and adopted the decision of Division One of this court in *Greenfield v. Cheek*, 122 Ariz. 70, 593 P.2d 293 (App.1978) and held that an intent to deceive, manipulate or defraud is a prerequisite to a claim for relief under A.R.S. Sec. 44–1991(2). The Court of Appeals based its holding on *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We believe Division One and the Supreme Court misconstrued the holding of *Ernst & Ernst*, inappropriately applied its reasoning to A.R.S. Sec. 44–1991(2), misconstrued a decision of the United States Court of Appeals, and partially relied on a federal district court case which has been reversed on appeal.

In *Greenfield*, the court stated:

"The United States Supreme Court held in *Ernst & Ernst v. Hochfelder* [citation omitted] that an intent to deceive, manipulate, or defraud (scienter) is essential to a private cause of action for damages under § 10(b) of the Securities Act of 1934 and S.E.C. Rule 10b–5." 593 P.2d at 296.

We do not believe that this statement is correct. The issue in *Ernst & Ernst* was

whether an accounting firm could be held liable in a private action for damages under Sec. 10(b) of the 1934 Act and Rule 10b–5 on the basis of negligence. The Supreme Court held that it could not and that some proof of scienter had to be alleged and proved. While the court stated that an intent to defraud, manipulate or deceive was "embraced in the definition of scienter" it did not hold that this upper limit of the meaning of scienter was the only scienter applicable and that other non–negligent conduct would not satisfy the scienter requirement. It has been stated:

"In its recent decision in *Ernst & Ernst v. Hochfelder*, the United States Supreme Court used the word 'scienter' to describe the degree of culpability necessary to support a private cause of action under section 10(b) of the Securities and Exchange Act of 1934 (the 1934 Act) and Securities and Exchange Commission (SEC) rule 10b–5. Beyond ruling out negligent behavior as a sufficient basis for rule 10b–5 liability, however, the Court's invocation of the scienter standard did little to clarify the much–debated issue of what state of mind is necessary for rule 10b–5 liability. Scienter is a many–faceted concept, which in 10b–5 cases has encompassed states of mind ranging from an intention to deceive, to knowledge of undisclosed facts, to a reckless failure to acquire knowledge of the true facts. Although the *Ernst & Ernst* Court initially defined scienter as 'a mental state embracing intent to deceive, manipulate, or defraud,' apparently on the stricter end of the spectrum of apparent meanings of scienter, it specifically declined to decide whether 'reckless behavior,' on the less strict end of the spectrum 'is sufficient for civil liability under § 10(b) and rule 10b–5.' Moreover, the Court failed to state explicitly whether scienter is present even when knowledge is shown but when there is no proof of an intent to deceive."

Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder*, 29 Stan.L.Rev. 213, 213–14 (1977).

The limited nature of the holding of *Ernst & Ernst* was also noted in *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir. 1978), cert. den. 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431:

"*Ernst & Ernst*, we think, only went so far as to eliminate negligence as a basis for liability. We agree with those courts which have found that Congress intended the ambit of Sec. 10(b) to reach a broad category of behavior, including knowing or reckless conduct." 576 F.2d at 1337.

See also *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2nd Cir. 1978), cert. den. 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698; *In re Gap Stores Sec. Lit.*, 457 F.Supp. 1135 (N.D. Cal. 1978); *In re TransOcean Tender Offer Sec. Lit.*, 455 F.Supp. 999 (N.D. Ill. 1978); *McLean v. Alexander*, 420 F.Supp. 1057 (D. Del. 1976). We believe the foregoing authorities demonstrate that *Greenfield* was incorrect in its characterization of the holding in *Ernst & Ernst*.

. We now turn to the statute and rule involved in *Ernst & Ernst*. Sec. 10(b) of the Securities Exchange Act of 1934 under which rule 10b–5 was adopted, proscribes the "use or employment of any manipulative or deceptive device or contrivance" in contravention of the rules and regulations adopted by the Commission in connection with the purchase or sale of a security.

Rule 10b–5 makes it unlawful:

"(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ."

The Supreme Court, in holding that allegation and proof of scienter were essential, based its decision on the legislative history and language of Sec. 10(b). The Court concluded that the phrase "manipulative or

deceptive" when used in conjunction with "device or contrivance", and viewed in the light of the statute's legislative history, "connotes intentional or willful misconduct". 425 U.S. at 197–99, 96 S.Ct. at 1383–84, 47 L.Ed.2d at 679–80. It further concluded that, although the broader language of rule 10b–5 would encompass negligent behavior, "its scope cannot exceed the power granted the Commission by Congress under § 10(b)." 425 U.S. at 214, 96 S.Ct. at 1391.[2]

None of the reasons for the decision in *Ernst & Ernst* exist in Arizona. Arizona does not have a statute similar to Sec. 10(b) and the tension between the administrative rule and Sec. 10(b) which existed in *Ernst & Ernst* simply does not exist in Arizona. Nor does Arizona have the legislative history which was present in *Ernst & Ernst.* How, then, did *Greenfield* conclude that the reasoning of *Ernst & Ernst* should be applied to A.R.S. Sec. 44–1991(2)? The *Greenfield* court noted that A.R.S. Sec. 44–1991 is almost identical to 15 U.S.C. Sec. 77q (Sec. 17(a) of the Securities Act of 1933). The Arizona statute provided:

"It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under § 44–1843 and including transactions exempted under § 44–1844, directly or indirectly to do any of the following:

1. Employ any device, scheme or artifice to defraud.

2. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."

15 U.S.C. Sec. 77q (Sec. 17(a) of the 1933 Act) provides:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

In support of its conclusion that A.R.S. Sec. 44–1991(2) imposes the *Ernst & Ernst* scienter requirement, *Greenfield* states that the Fourth Circuit in *Johns Hopkins University v. Hutton*, 488 F.2d 912 (4th Cir. 1973), cert. den. 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974) decided prior to *Ernst & Ernst*, recognized scienter as a necessary element in actions under Sec. 17(a) of the 1933 Act. It also cites *S.E.C. v. American Realty Trust*, 429 F.Supp. 1148 (E.D. Va. 1977) as a post–*Ernst & Ernst* case supporting its conclusion. On November 17, 1978, in *S.E.C. v. American Realty & Trust*, 586 F.2d 1001 (4th Cir. 1978) the court reversed the decision of the district court relied on in *Greenfield.* In so doing, it commented on the *Greenfield* position:

"The *Greenfield* court's reliance on our decision in *Johns Hopkins University v. Hutton* [citation omitted] is misplaced. There we noted in passing that the defendant's willful lie 'would clearly supply the element of scienter necessary to support a cause of action under sections 10(b) and 17.' The *Johns Hopkins* case contains no further 'discussion' of the scienter issue. The opinion did not even speci-

---

**2.** Compare Rule 10(b) with A.R.S. Sec. 44–1991 infra. Since Sec. 44–1991 is not limited by any statute comparable to Sec. 10(b) of the 1934

Act, the United States Supreme Court would presumably hold that our statute encompassed negligent behavior.

fy that the action was based on section 17(a)(2); it could have rested on 17(a)(1) or 17(a)(3).

In our view, the quoted passage merely meant that scienter was not an issue in the case because even if scienter were required, the defendant's knowing deception clearly met any test of willful wrongdoing." 586 F.2d at 1006, n. 5. The Fourth Circuit made it clear that it did not agree with the concept that because of the similarity between the language of Sec. 17(a)(2) and that of rule 10b–5 proof of scienter was required by *Ernst & Ernst*:

"The Supreme Court's conclusion in *Ernst & Ernst v. Hochfelder* was that rule 10b–5 should be read in light of the statute and that the rule could be no broader than the statute under which it was promulgated. Under those circumstances, the importation of the manipulative device language of the statute into Rule 10b–5 has no bearing upon the proper interpretation of Sec. 17(a)(2).

Sec. 17(a) is a Congressional enactment, not a product of the Commission's rule-making authority. It speaks only of untrue statements of material fact and material omissions. Material misstatements and material omissions may be the product of negligence as well of willfulness, and there is nothing in the language of § 17(a) to suggest that the Congressional intent was to reach the one and not the other. Moreover, § 17(a)(2) is bracketed between § 17(a)(1) and § 17(a)(3), which contain explicit references to fraud. Surely when enacting these sections, it would have included in § 17(a)(2) language referable to fraud or willfulness if that had been the Congressional intent.

Nor do we find anything in the legislative history of § 17 which indicates that the Congress did not intend a literal reading of the language of § 17(a)(2). That history has been recently canvassed by the Second Circuit in its opinion in *S.E.C. v. Coven*, 581 F.2d 1020 (2nd Cir. 1978). We need not repeat that canvass here or references to the authorities marshalled by Judge Mansfield in that opinion. We find ourselves in complete agreement with the Second Circuit." 586 F.2d at 1006.

In *Securities and Exchange Commission v. Coven*, 581 F.2d 1020 (2nd Cir. 1978), cert. den. 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979), the court noted the difference between the language of Sec. 10(b) of the 1934 Act and 17(a) of the 1933 Act and stated:

"This wording [Sec. 17(a)] is virtually identical to that of Rule 10b–5, which the Supreme Court suggested in *Hochfelder* would subject wrongdoers to liability for negligence were it not for the fact the rule can be no broader than the statute under which the rule was promulgated. 425 U.S. at 212, 96 S.Ct. 1375. As the Court stated, the language of subsection (2) of § 17(a) gives no indication that liability is predicated on fraudulent intent. *Id.* Moreover, the clear import of the critical phrase in subsection (3), 'operates as a fraud,' is to focus attention on the *effect* of potentially misleading conduct on the public, not on the culpability of the person responsible. Absent any terminology in § 17(a) comparable to 'manipulative or deceptive device or contrivance' in § 10(b) *upon which the Supreme* Court relied heavily in *Hochfelder*, we see no reason to give § 17(a) a similarly narrow reading." 581 F.2d at 1026–27.

\* \* \* \* \* \*

Congress thus opted for liability without willfulness, intent to defraud, or the like, in enacting § 17(a). Indeed, William O. Douglas, who was soon to head the SEC and later to become a Justice of the Supreme Court, wrote contemporaneously that § 17 makes unlawful 'even innocent acts to obtain money or property by means of untrue statements of material facts or omissions to state material facts.' Douglas & Bates, The Federal Securities Act of 1933, 43 Yale L.J. 171, 181 (1933) ...'" 581 F.2d at 1026–27.

*Greenfield* also quotes *White v. Abrams*, 495 F.2d 724, 727 n. 2 (9th Cir. 1974) for the proposition that the elements of a private cause of action under Sec. 17(a) are the

same as those under Sec. 10(b). We find this authority questionable. *White v. Abrams*, supra, decided before *Ernst & Ernst*, rejected scienter or any other discussion of state of mind as a necessary element of a 10b–5 action. The footnote relied on a case from the Second Circuit Court of Appeals which court, in *S.E.C. v. Coven*, supra, rejected a theory that the scienter requirement of *Ernst & Ernst* applies to Sec. 17(a) of the Securities Act of 1933.

Finally, *Greenfield* relies on *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790 (7th Cir. 1977); *Malik v. Universal Resources Corp.*, 425 F.Supp. 350 (S.D. Cal. 1976) and *Vacca v. Intra Management Corp.*, 415 F.Supp. 248 (E.D. Pa. 1976). The reasoning in these three cases demonstrates the fallacy of applying *Ernst & Ernst* to A.R.S. Sec. 44–1991(2). They state, as did *Ernst & Ernst* that the 1933 Act and 1934 Act are complementary and thus if Sec. 10(b) of the Act of 1934 and SEC rule 10b–5 were read to allow a private cause of action for negligence, then the procedural limitations of Secs. 11, 12(2) and 15 of the 1933 Act, 15 U.S.C. Secs. 77k, 77*l*(2), 77*o*, could be evaded simply by bringing an action under Sec. 10(b) of the 1934 Act which has no such requirements. Since Arizona does not have any statutes which compare to Secs. 77k, 77*l*(2) and 77*o*, the reasoning of these cases should not apply.

■ Statutory language that is clear and unambiguous generally requires no judicial construction. *Smith v. Pima County Law Enforcement Council*, 113 Ariz. 154, 548 P.2d 1151 (1976). A.R.S. Sec. 44–1991(2) is clear and unambiguous. The statutory scheme embraced in the Securities Act of 1933 and the Securities Exchange Act of 1934 does not exist in Arizona. If A.R.S. Sec. 44–1991(2) needed judicial construction, we should look to the intent of our own legislature, not the dissimilar federal statutes and the federal cases interpreting them.

In any event, *Greenfield* is a civil case. We are dealing here with a criminal violation. A.R.S. Sec. 44–1995, prior to its amendment in 1978, stated:

"A person violating a provision of this article is guilty of a felony punishable as provided in subsection A of § 44–2036."

Sec. 44–2036(A)[3] imposed criminal liability if the violation was willful. In *State v. Burrows*, 13 Ariz.App. 130, 474 P.2d 849 (1970), we held that a violation of other sections of the Act was malum prohibitum. For the same reasons expressed in *Burrows*, we hold that a criminal violation under A.R.S. Sec. 44–1995 and Sec. 44–2036(A) is malum prohibitum. A specific intent, an evil motive or knowledge that the law was being violated is not required in order to find a criminal violation. See *State v. Russell*, 119 N.J.Super. 344, 291 A.2d 583 (1972). Even if *Ernst & Ernst* were applicable here, a specific intent to defraud would not be required for a criminal violation. *United States v. Chiarella*, 588 F.2d 1358 (2nd Cir. 1978), cert. granted, 441 U.S. 942, 99 S.Ct. 2158, 60 L.Ed.2d 1043 (1979).

## WAS APPELLANT A REAL PROPERTY SECURITIES DEALER?

■ The trial court specifically found that appellant was guilty of Counts 166 and 167 because he knew that the Real Property Securities Dealers Act required that he post a bond and file an annual report and that he knowingly failed to comply with these requirements.

The state suggests that because O'Brien, a co–conspirator under Count One, failed to comply, the criminal act of O'Brien is the act of all the conspirators and therefore appellant is criminally culpable. The trial court, however, did not find appellant guilty on this theory and we do not know whether it would have done so. Furthermore, this was not the state's theory below.

In order to find appellant guilty of Counts 166 and 167 the state had to prove that he was a real property securities dealer and that he sold the notes and mortgages to the public. Sec. 44–2066 provides:

"In this article, unless the context otherwise requires:

\* \* \* \* \* \*

---

**3.** Although amended in 1978, the pertinent language did not change.

2. 'Real Property Securities Dealer' means any person, acting as principal or agent, who engages in the business of . . .

(a) Selling real property securities as defined in paragraph 3, to the public.

\* \* \* \* \* \*

3. 'Real Property Security':

(a) Means a contract made in connection with the sale of a single promissory note secured directly or collaterally by a lien on real property or a single real property sales contract when the real property securities dealer or his principal agrees to do or implies that he will do any of the following:

(i) Guarantee the note or contract against loss at any time.

(ii) Guarantee that payments of principal or interest will be paid in conformity with the terms of the note or contract.

(iii) Assume any payments necessary to protect the security of the note or contract.

(iv) Accept, from time to time, partial payments towards the purchase of the note or contract.

(v) Guarantee specific yield or return on the note or contract.

(vi) Pay with his own funds any interest or premium for a period prior to actual purchase and delivery of the note or contract.

(vii) Pay with his own funds any money after the note or contract falls into arrears.

(viii) Repurchase the note or contract.

\* \* \* \* \* \*"

There was no proof here that any contracts as defined by A.R.S. Sec. 44–2066(3)(a) were made by appellant or AR&MT in connection with the sales of the notes and mortgages to Equitable.

## SUFFICIENCY OF THE EVIDENCE, COUNTS 2 and 23

■■ The trial court specifically found that appellant aided and abetted the sales of the mortgages to Birenbaum and Nuel. The relevant question is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The record shows that AR&MT transferred lot 179 of Verde Lakes Estates to Equitable so that Equitable could create a mortgage and in turn generate capital necessary for its operations. According to O'Brien, appellant knew the purpose of the transfer, supplied Equitable with the blank note and mortgage forms and showed O'Brien how to fill them out to "create" a mortgage. O'Brien in turn created a fictitious mortgage on lot 179 with his wife as mortgagor, using her maiden name of Carol Palys. O'Brien then sold this fictitious mortgage to Mrs. Birenbaum. O'Brien told Mrs. Birenbaum, inter alia, that Palys had mortgaged her property to Equitable in return for a $4,410 loan. This was untrue. No money had changed hands and A.R.S. Sec. 44–1991(2) was violated. While it may be true that appellant did not know that O'Brien's wife would be used to create the mortgage, O'Brien's testimony shows that appellant knew phony mortgages were going to be created and therefore knew that untrue and misleading statements would be made to the buyers of these mortgages. Thus, appellant did aid and abet the violation that occurred with the sale to Birenbaum.

Count 23 involves a mortgage which was sold by AR&MT to Equitable. The mortgage was on a vacant desert lot near Benson, Arizona and then sold by Equitable to Nuel. A salesman for Equitable told Nuel and his mother that the mortgaged property was a residence located at 6341 Calle Osito in Tucson. The state argued to the trial court that appellant was an aider and abettor in violation of A.R.S. Sec. 44–1991(2) because he supplied the mortgage. We do not agree. There is no evidence that appellant knew any misstatements were going to be made by the salesman. The state again seeks to justify the conviction on the conspiracy theory, to–wit, the act of one co–conspirator is the act of all. However,

**122**

the salesman was never indicted as a co-conspirator and the state does not suggest that he was an unindicted co-conspirator or acting under the orders of any of the conspirators.

## SUFFICIENCY OF EVIDENCE, COUNT I

 Appellant contends there was insufficient evidence to convict him of the conspiracy count. We do not agree. It is clear from the trial court's findings that it agreed with the state's theory that Equitable Mortgage was created by Ned Warren in order to sell to the public land and mortgages owned by Consolidated Mortgage Company, a financially ailing company that had been controlled in the past by Ned Warren and had been taken over by Gunnison and AR&MT. The plan was for Gunnison to supply mortgages and property from Consolidated to Equitable. From the profits of AR&MT derived from the sales generated by Equitable, Ned Warren was to get a "consultant's fee". According to the state's theory, part of the plan was to represent to the public that the mortgages sold by Equitable were securities qualified for public sale under the Real Property Securities Dealers Act but Equitable never intended to qualify the securities. Ads were placed in the newspapers stating that the securities were qualified for sale under the Act. In spite of the fact that O'Brien, Warren and Gunnison knew they were not true, the ads were run in the newspapers for approximately three months. It is clear that the mortgages sold by Equitable were real property securities as defined by the Act since Equitable made agreements in connection with the sales which fall under A.R.S. Sec. 44–2066(3)(a)(i)–(viii). The evidence on Count One satisfies the test of *Jackson v. Virginia*, supra.

Appellant's convictions on Counts One and Two are affirmed and his convictions on Counts 23, 166 and 167 are reversed.

RICHMOND, C. J., and HATHAWAY, J., concur.