SECURITIES AND EXCHANGE
COMMISSION, Appellant,

v.

AMERICAN REALTY TRUST, Thomas
J. Broyhill, Appellees.

No. 77–1839.

United States Court of Appeals,
Fourth Circuit.

Argued May 4, 1978.

Decided Nov. 17, 1978.

Stanley Sporkin, Atty., Securities and Exchange Commission, Washington, D.C. (Harvey L. Pitt, Gen. Counsel, Paul Gonson, Kathryn B. McGrath, Associate Gen. Counsels, Vernon I. Zvoleff, Sp. Counsel, Michael A. Starr, Kathleen G. Gallagher, Attys., Securities & Exchange Commission, Washington, D.C., on brief), for appellant.

Philip N. Smith, Jr., Washington, D.C. (Meyer Eisenberg, J. Kent Jarrell, Lawler, Kent & Eisenberg, Washington, D.C., Louis Koutoulakos, Varoutsos & Koutoulakos, Arlington, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, RUSSELL, Circuit Judge, and FIELD, Senior Circuit Judge.

HAYNSWORTH, Chief Judge:

The Securities and Exchange Commission sought an injunction against future violations of the securities laws by American Realty Trust and its president, Thomas Broyhill. Though the judge found a failure to disclose a material fact in a prospectus, he did not find a failure to disclose other material facts as charged by the Commission, and he concluded that the one failure of disclosure was not a violation of any statute because of a failure of proof of scienter. We conclude that several violations of the Act were proven, and that in an action for an injunction against future violations brought by the Commission, proof of scienter is unnecessary.

The Commission charged ART with failure to disclose material information in a prospectus issued in connection with the sale of debentures, in two forms 10K filed with the Commission and in a proxy statement. Since we conclude that with respect to three of the transactions there was a failure to disclose material information in the prospectus, we need not be concerned with the sufficiency of the disclosures in other documents. And because of the Supreme Court's holding in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, that scienter must be proven in a private action brought under § 10(b) [1] and Rule 10b–5, we will confine our attention to § 17 of the Securities Act of 1933.[2]

Since we have concluded that three violations of § 17(a) were established in the record, an injunction against future violations of the securities laws should be granted.

I.

In 1971 Thomas Broyhill, the president of ART, a real estate investment trust, his cousin, Joel Broyhill, and a man named DeLuca entered into negotiations looking toward the development of a condominium project on Arlington Ridge Road in Arlington, Virginia. For that purpose, Joel Broyhill and DeLuca formed a partnership known as Arlington Ridge Road Associates. ART made a loan commitment of $10.8 million, and it was understood that neither Joel Broyhill nor DeLuca were to have any personal liability for the repayment of funds advanced.

ART encountered difficulties in raising funds it had agreed to commit to the

1. 15 U.S.C.A. § 78j(b).

2. 15 U.S.C.A. § 77q.

project, and it also became apparent that the total cost of the project was going to exceed the amount of ART's initial commitment. A new agreement was then worked out with Chase Manhattan Realty, a subsidiary of Chase Manhattan Bancorp. Under the new agreement, Chase Manhattan Realty agreed to advance $10 million, and ART agreed to advance such additional funds as would be required for completion of the project. The necessary additional funds were then estimated to be approximately $2,500,000, later increased to $3,200,000, of which ART had already advanced approximately $1.3 million.

The funds previously advanced by ART had been on an open account, but Chase Manhattan Realty insisted upon taking appropriate security, including personal guarantees of repayment of Joel Broyhill, DeLuca and their wives. Joel Broyhill and DeLuca were unhappy with their exposure and that of their wives to personal liabilities, and they sought an indemnification agreement from ART. In February 1974, Thomas Broyhill for ART agreed to indemnify Joel Broyhill, DeLuca and their wives for any personal liabilities imposed upon them in connection with the construction loan.

In the prospectus issued in March 1974 in connection with the issuance of new debentures, there was a disclosure that ART and Chase Manhattan Realty had made a commitment to Arlington Ridge Road Associates to advance construction funds in the approximate amount of $13,200,000, of which $10,000,000 was to be advanced by Chase Manhattan Realty, while the remainder of the construction funds required would be advanced by ART. There was no disclosure that the partners of Arlington Ridge Road Associates were not personally liable for repayment of the construction loan, nor that ART had become a guarantor of complete repayment of Chase Manhattan Realty's $10,000,000 portion of the loan. The guarantee, of course, had had the effect of subordinating ART's claim for repayment of funds it had advanced, and was to advance, upon its commitment to Chase Manhattan's claim for repayment of funds it advanced. The risk that the project should prove to be a failure was entirely upon ART, and its indemnification agreement was a contingent liability of up to $10,000,000.

## II.

ART owned a number of hotels and motels, some of which were leased to Virginia Hotel Management Co., Inc. Sons and daughters of three of the trustees of ART owned 49.44% of the outstanding stock of Virginia Hotel Management. Hotel Management, however, had encountered financial difficulties and in February 1974, when work was underway in preparation of the March 12, 1974 prospectus, there was an arrearage in rental payments due by Hotel Management to ART of $368,000. Outside financing being unavailable to Hotel Management, DeLuca of Arlington Ridge Road Associates and Broyhill agreed that ART would advance $368,000 to Arlington Ridge Road, purportedly pursuant to its commitment of construction funds. Arlington Ridge Road would then lend $368,000 to Hotel Management, which would use the money to pay the rent to ART. That was done, and Virginia Hotel Management gave Arlington Ridge Road Associates a note in which there was a provision that if the note were not paid at maturity, Hotel Management would issue to Arlington Ridge Road its own stock in an amount equal to 49% of the stock outstanding after issuance of the new stock to Arlington Ridge Road, and issuance of the stock would be repayment of the debt.

In ART's prospectus there was a disclosure that Hotel Management had a substantial negative net worth, that Arlington Ridge Road, to which ART had advanced construction money, had lent Hotel Management $368,000 and that Hotel Management had used "part of the proceeds" to pay certain rent arrearages to ART. It was not disclosed that all of the $368,000 had been used for that purpose. It was also disclosed that Thomas Broyhill had "interceded" in connection with the making of the loan by Arlington Ridge Road to Hotel Management.

A highly suspicious person reading the actual disclosures might have suspected that all of the funds lent by Arlington Ridge Road to Hotel Management was a diversion of construction funds made with ART's consent and approval and that all, rather than a part, of that money was used to pay Hotel Management's debt to ART in a scheme to clean up ART's balance sheet as it would appear in the prospectus. More trusting persons, however, might well have supposed that the $368,000 was derived from other funds available to Arlington Ridge Road than the construction funds committed to it. The trusting fellow surely would not have supposed that more than a part of the $368,000 had been used by Hotel Management to pay to ART rent in arrears.

### III.

Thomas Broyhill's daughter, Sandra Broyhill Aman, her husband, and a Mr. and Mrs. Kincheloe entered into a joint venture to acquire and develop a tract of land known as Rolling Wood. The land was to be acquired in a trust of which the Kincheloes and Sandra Aman were the beneficiaries, and Sandra Aman agreed to guarantee repayment of one-half of the indebtedness to be incurred in the venture. Herbert and Sandra Aman controlled a company known as Hersan Builders, which was to do all construction work necessary in the development of Rolling Wood.

Kincheloe sought financing for the joint venture from Thomas Broyhill and ART. He testified he did not tell Broyhill of Sandra Aman's interest in the venture, though that his daughter and son-in-law may have had something to do with it should have been suggested to him because Kincheloe had attached to the loan application a copy of a contract between Hersan Builders and the prospective grantor of Rolling Wood.

Apparently with no further inquiry, ART lent $1.2 million to Kincheloe, repayment of which was personally guaranteed by Kincheloe and his wife.

During 1973 and 1974 Thomas Broyhill met frequently with Kincheloe and now and then with Herbert Aman to discuss the progress being made on the Rolling Wood project. In December 1973, Herbert Aman wrote to Thomas Broyhill requesting reimbursement from ART for expenses he had incurred in connection with the Rolling Wood project. Those expenses were stated on an invoice addressed to Aman copies of which Kincheloe, on more than one occasion, had sent to Broyhill with the request that the invoice be paid by ART. Still, the witnesses testified that no one told Thomas Broyhill that his daughter, Sandra, had any interest in the project.

No disclosure of Sandra Aman's interest in Rolling Wood was made in the March 1974 prospectus.

### IV.

The district court recognized that the failure to disclose the agreement to indemnify the partners of Arlington Ridge Road was a material omission from the proxy statement. Indeed it was, for it created a contingent liability of up to $10,000,-000 and had the additional effect of subordinating ART's claim for repayment of construction funds advanced to the claim of Chase Manhattan Realty. The judge found that it was not a violation of the Act, however, for he found that the omission was the result of negligence and that there was an absence of scienter, which, he concluded, was essential for the issuance of an injunction.

As to the $368,000 receivable from Hotel Management, the judge concluded that there had been no omission of a material fact. More than $368,000 was due on ART's commitment to Arlington Ridge Road, which led the judge to conclude that ART had done no more than to honor its commitment. In the discussion in the prospectus of the transactions of Arlington Ridge Road, it was stated that funds advanced to it had been used in part for construction purposes, the loan by Arlington Ridge Road to Hotel Management was fully disclosed, and the judge concluded that no one would be misled by the statement that Hotel Management used the

$368,000 in part to pay rent arrearages. The trouble with this, however, is that ART had no obligation to advance funds to Arlington Ridge Road for any purpose except for construction of the apartment complex. A loan of money to be relent to Hotel Management was wholly outside ART's construction fund commitment. An investor, informed of a commitment of construction funds, would not be expected to realize that ART had lent the $368,000 to Arlington Ridge Road, even though it was stated in the prospectus that Arlington Ridge Road had used the funds advanced in part for construction purposes. The initial agreement was that the partners of Arlington Ridge Road would put up no capital of their own; they were solely dependent upon the advances from ART and Chase Manhattan Realty, and some of those funds necessarily had to be spent for administrative costs. It was thus necessary to state that the funds advanced to Arlington Ridge Road Associates had been used in part for construction costs. A reader, from the combination of disclosures, would not infer that ART had supplied the money flowing through Arlington Ridge Road and Hotel Management back to ART in purported payment of Hotel Management's rental arrearages. The district judge also thought that the disclosure that Thomas Broyhill had "interceded" in connection with the loan from Arlington Ridge Road to Hotel Management sufficiently disclosed that he had arranged it. Broyhill and ART clearly had an interest in the financing of Hotel Management, from which ART derived very substantial rental income. The reported intercession of Broyhill would not suggest to the reader that Broyhill had arranged a mechanism to eliminate the necessity to report so large an arrearage of rent in the March prospectus.

■ Finally, the judge concluded that Broyhill was unaware of the interest of his daughter and son-in-law in Rolling Wood. He accepted the testimony of the witnesses that during 1973 and the early part of 1974 no one told him of their interest, that he probably had not seen the note from his son-in-law, and that he usually left to his subordinates such details as noticing to whom approved invoices were addressed. He found that though Broyhill had many opportunities to discover the interest of the Amans in Rolling Wood, he had no actual knowledge of it when the March 1974 prospectus issued.

Broyhill knew that Kincheloe and the Amans had a number of business dealings together. On occasion he had talked to Aman about progress of the Rolling Wood project. In light of a formal policy of ART against loans to members of their families, ordinary care surely required inquiry by Broyhill of his son-in-law or daughter or of Kincheloe about the possibility of the Amans having an interest in Rolling Wood.

Furthermore, we think the omission was a material one, for there is a great temptation to leniency on the part of a father when he knows that losses imposed by a strict enforcement of the rights of ART would fall upon his daughter. Materiality is also indicated by the fact that ART itself recognized that loans to members of its Board of Trustees or members of their families created special problems and were beyond the power of one loan officer to commit.

## V.

■ Section 17(a)(2) of the 1933 Act[3] proscribes:

> any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading

in order to obtain money or property in connection with the offer or sale of a security.

Because of the similarity between the language of § 17(a)(2) and that of Rule 10b 5, it is suggested that proof of scienter is required by the Supreme Court's holding in *Ernst & Ernst v. Hochfelder*, 425 U.S.

---

**3.** 15 U.S.C.A. § 77q(a)(2).

185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1977) that it is not enough to show mere negligence in a private damage action under Rule 10b–5. The Supreme Court, however, held that proof of scienter was requisite in a private action under Rule 10b–5 not because of the language of the Rule but because of the language of the statute under which it was adopted. Section 10(b) of the Securities Exchange Act of 1934,[4] under which Rule 10b–5 was adopted, proscribes the use or employment of "any manipulative or deceptive device or contrivance" in contravention of the rules and regulations adopted by the Commission in connection with the purchase or sale of a security. The language of the statute clearly contemplates the presence of fraud, or something in the nature of fraud, as an essential part of the cause of action founded upon § 10(b). The Supreme Court's conclusion in *Ernst & Ernst v. Hochfelder* was that Rule 10b–5 should be read in light of the statute and that the rule could be no broader than the statute under which it was promulgated. Under those circumstances, the importation of the manipulative device language of the statute into Rule 10b–5 has no bearing upon a proper interpretation of § 17(a)(2).

Section 17(a) is a Congressional enactment, not a product of the Commission's rulemaking authority. It speaks only of untrue statements of material fact and material omissions. Material misstatements and material omissions may be the product of negligence as well as of willfulness, and there is nothing in the language of § 17(a) to suggest that the Congressional intent was to reach the one and not the other. Moreover, § 17(a)(2) is bracketed between § 17(a)(1) and § 17(a)(3), which contain explicit references to fraud. Surely when enacting these sections, it would have included in § 17(a)(2) language referable to fraud or willfulness if that had been the Congressional intent.

Nor do we find anything in the legislative history of § 17 which indicates that Congress did not intend a literal reading of the language of § 17(a)(2). That history has been recently canvassed by the Second Circuit in its opinion in *S.E.C. v. Coven*, 581 F.2d 1020 (2d Cir. 1978). We need not repeat that canvass here or references to the authorities marshalled by Judge Mansfield in that opinion. We find ourselves in complete agreement with the Second Circuit.

The Seventh Circuit has indicated a contrary reading of § 17(a)(2). *See Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 794–95 (7th Cir. 1977).[5] It did so, however, in the context of a private right of action for damages and an assumption, without deciding, that a private right of action might be inferred under § 17(a)(2). It noted that the question whether a private right of action might be inferred under § 17(a)(2) is unsettled, and it might well have resolved that litigation by deciding that no private right of action was to be inferred. Other statutes do create private rights of action, but they require proof of greater wrong than § 17(a)(2) or subject the right to substantial limitations not applicable under § 17(a)(2). The question is not now before us in this suit by the Commission, but to hold that § 17(a)(2) creates a private right of action would probably require some substantial disregard of the whole legislative scheme. Instead, the Seventh Circuit assumed that even if § 17(a)(2) created a private right of action, similarity with other

---

**4.** 15 U.S.C.A. § 78j(b).

**5.** *See also Greenfield v. Cheek* [Current] CCH Sec.L.Rep. ' 96,560 (Ariz.App., Sept. 19, 1978) (requiring scienter in damage action).

The *Greenfield* court's reliance on our decision in *John Hopkins Univ. v. Hutton*, 442 F.2d 1124 (1970), is misplaced. There we noted in passing that the defendant's willful lie "would clearly supply the element of scienter necessary to support a cause of action under sections 10(b)

and 17." The *John Hopkins* case contains no further "discussion" of the scienter issue. The opinion did not even specify that the action was based on section 17(a)(2); it could have rested on 17(a)(1) or 17(a)(3).

In our view, the quoted passage merely meant that scienter was not an issue in the case because even if scienter were required, the defendant's knowing deception clearly met any test of willful wrongdoing.

sections of the statute would require that § 17(a)(2) be interpreted as including a requirement of fraud or willfulness, proof of a good deal more than mere negligence. We would agree with the result in *Sanders*, but the considerations which led the Seventh Circuit to that conclusion in dealing with a private right of action are simply irrelevant in this action by the Commission. This is an action for an injunction. No penalties are sought to be imposed.

Proof of negligent misstatements or negligent omissions in a prospectus establishes an affront to the goal the statutes sought to achieve of open disclosure of all relevant information which a reasonable person would wish in deciding whether to buy or to sell. If by reason of negligence there is falsity in a prospectus of an issuer who reasonably may be expected to issue other securities on the basis of another prospectus, the availability of injunctive relief could certainly have been thought by the Congress to be desirable. An injunction in such a case can provide substantial assurance that the negligent issuer will take more pains the next time to avoid all falsity. If, because his conduct was merely negligent such an issuer is subject to no penalty and to no injunctive relief, he is free to act negligently in the future with the risk of production of more false statements, effectiveness of the statutes would be seriously impaired.

We have not considered the finding of the district court that ART and Broyhill were merely negligent in their misstatements in references to the transaction with Arlington Ridge Road. The fact that Broyhill knew all about those transactions strongly suggests conscious suppression. The presence of the other violations we have found reinforce the suggestion. But we need not find fraud or willfulness in the conduct of ART and Broyhill. It is enough that the material statements and material omissions that we have identified were the consequence of negligence.

Since at least three violations were established and since the proof of negligent conduct was strong, injunctive relief should be granted.

The Commission also sought supplemental relief, such as the removal from office of Thomas Broyhill. Since the district court denied the basic injunctive relief, it did not reach the question of supplemental relief. On remand, the district court should address itself to the scope of the injunctive relief to be granted after further submissions by the parties. Further proceedings shall be conducted in accordance with this opinion.

REVERSED AND REMANDED.