In the Matter of Norbert RAHM a/k/a
Bert Rahm and Lotte U.
Rahm, Bankrupts.

Charles F. SMITH, Plaintiff,

v.

Norbert RAHM and Lotte U.
Rahm, Defendants.

Bankruptcy Nos. 77–917–A, 77–918–A.

United States Bankruptcy Court,
E. D. Virginia.

Dec. 14, 1979.

Norbert Rahm and Lotte Rahm, McLean, Va., Roy B. Zimmerman, Alexandria, Va., for Bankrupts.

John J. Czyzewski, Fairfax, Va., for Charles F. Smith.

Richard A. Bartl, Trustee, Alexandria, Va., for defendants.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

This proceeding involving a multi-day trial contains a somewhat unusual factual situation. The plaintiff and defendant in the past have been friends and business associates. On several occasions they were both employed by the same companies and in each instance it appears that the defendant was the plaintiff's superior. This turn of events began with Page Communications, Inc. where the defendant, who was Director of Budget Finance Office, gave Smith, the plaintiff, in Smith's own words, "his first big break". Later the defendant Rahm left Page to become Chief Financial Officer of Documentation, Incorporated, and the plaintiff joined him there. Rahm then departed to assume the position of Comptroller of Ringling Brothers-Barnum and Bailey Circus and while there, hired the plaintiff as Assistant Comptroller.

Rahm resigned Ringling Brothers to become an administrative officer with the Girl Scouts of America. After leaving this position Rahm purchased several shoe companies, one of which was involved in a Chapter 11 proceeding at the time of purchase. He also purchased two other companies which were forced to file bankruptcy. Thereafter, he and the plaintiff began a course of mutual investment in several corporate business ventures. Subsequently dissatisfaction and disagreements arose between them and the parties entered into an agreement to divide the various corporate holdings. This agreement is in evidence as plaintiff's Exhibit 16. All of these holdings later failed and it is from these circumstances this litigation arose. It must be concluded from this and other evidence in the record that the defendant has had considerable experience in corporate business, financial and related matters.

Charles F. Smith, the plaintiff, now seeks denial under Section 14 of the Act of the discharge of the bankrupts, Norbert H. Rahm and Lotte U. Rahm, as well as an exception to Smith's debt pursuant to Section 17.

At the conclusion of the evidence for reasons set forth in the record Lotte U. Rahm was dismissed as a defendant and judgment was granted for the defendant Norbert Rahm on the following:

Count One: Paragraph 7 and 8(a)

Count Two: Paragraph 13

Count Three: In its entirety

■ Count One, paragraph 4, asserts that the bankrupt while an officer of Almark, Inc., on or about April 21–26, 1975, published a financial statement to obtain money or an extension or renewal of credit from the Arlington Trust Company and that the said statement understated liabilities of the bankrupt and overstated assets, and was therefore materially false.

The statement of April 21, 1975 given to Arlington Trust Company, now First Virginia Bank, failed to contain the liabilities of the three shoe companies owned by the bankrupt, Oliver Shoe Company, Roy Shoe Company or Florin Footwear Corporation, these omissions are conceded by the defendant who asserts that the assets of the three companies were also omitted and therefore the omissions "washed out". In addition

the defendant asserts that the plaintiff has failed to prove that the defendant knew or should have known that the assets of the companies would not fully amortize the omitted debt to Finance Company of America which was in excess of $200,000 as well as extinguish the debt for taxes in the amount of $41,600, and that there was no reliance on the statement.

A thorough examination of the evidence indicates that the allegation of overstated assets as to the statement of April 21, 1975 is not conclusively established by the record.

Concerning the question of reliance, E. Quinton Collins, Vice President of the Bank, testified that the loan was made only after the plaintiff, Charles F. Smith, and his wife, gave the bank a financial statement and personally endorsed the loan. Furthermore, the testimony is not clear as to whether the bank did in fact rely on the statement. Therefore, there is no preponderance of the evidence that the bank did rely on this financial statement of the defendant and for this reason as well as those stated above, this allegation cannot be sustained.

■ The thrust of paragraph 5 is similar to that of 4 above, however, this allegation charges that an alleged false statement dated July 1, 1977 was published by the defendant to the same bank. Collins testified that "this was an after the fact financial statement that he only took for the records".

Based on this testimony, there was obviously no reliance on this statement and this allegation must be determined in favor of the defendant.

■ The allegation of paragraph 6 is again similar to that of paragraphs 4 and 5. Here, however, the false financial statement is alleged to have been given to Planters Bank of Bridgewater, Virginia, between March 1976 and September 1977 while the bankrupt was an officer of certain corporations, to-wit: BTU Corporation, NORS Inc., and Virginia Wire. The statement in question is alleged to have understated liabilities and overstated assets.

The testimony reveals that in early 1976 the defendant Rahm gave O. M. Porterfield, President of First Virginia/Planters of Bridgewater, Virginia, his financial statement dated December 31, 1975, which is in evidence as plaintiff's Exhibit 3. This statement was given in connection with a personal guarantee of Rahm for obligations of Virginia Wire Corporation in which Rahm was an officer. The plaintiff alleges that the statement omitted a debt due Financial Corporation of America on which Rahm also was guarantor. This was a secured loan and there was ultimately a deficiency after foreclosure of $21,000. The defendant argues that there is no evidence in the record that the defendant knew of any such deficiency. Charles Bossalina, Vice President of Finance Company of America could not testify that any written notice was given to the defendant Rahm of this deficiency or that Rahm was ever put on notice of same. This was a contingent liability, however, and the defendant with his financial know-how should have been aware that this must be listed as a contingent liability.

Plaintiff further asserts that personal liabilities of Rahm for taxes due on Oliver Shoe Company were omitted. The defendant testified that he was not aware of any such taxes at the time he published the statement to Planters Bank in early 1976, however, he admits that he was advised by Internal Revenue Service in February 1976 that he was liable for taxes of the Roy Shoe Company, a very similar situation to that of Oliver, and that he was personally assessed for Oliver Shoe Company taxes in 1978 in the amount of $28,547.

The defendant was formerly comptroller of Barnum and Bailey Circus, and has considerable experience in financial matters. He testified at the 205 Hearing that he became aware of the tax liabilities in the Fall of 1974, and that they were of a nature that would be personally assessed against he and his wife. This was corroborated by the Internal Revenue Service in February 1976 when they apprised him of the tax liabilities. This knowledge was sufficient to put him on notice that there could be

personal liability for taxes in connection with Oliver and Florin. This is further corroborated by the evidence involving the 205 Hearing dealt with infra. He, therefore, should have included both contingent liabilities on his statement so as to apprise the bank.

As to reliance the witness O. M. Porterfield under examination by plaintiff testified that there was reliance by the Bank on Rahm's statement in connection with his personal guarantee. Based on this and the other evidence it is obvious that there was a meaningful reliance on the statement and this must be determined to be a false statement within the meaning of the Act.

Paragraph 8 alleges that the bankrupt has committed an offense punishable by imprisonment under Title 18, United States Code, Section 152.

(a) First that he placed stock ownership in his children. This allegation was denied at the conclusion of the evidence for reasons set forth in the record in that the plaintiff Smith followed the same course of action in registration of the stock. Title was placed in the children as part of the initial transaction which would certainly not be indicative of an attempt to defeat the bankruptcy law, in addition the evidence in the record does not support any such conclusion. Also alleged in paragraph 8(a) is the assertion that the defendant caused ProMark Inc. to receive contract rights belonging to Almark Inc., specifically the NuDell contract in contravention of Title 18 Section 152 which prevents the transfer or concealment of property by any individual or agent or officer of any person or corporation with intent to defeat the bankruptcy law when such act is done knowingly and fraudulently.

The NuDell contract was never offered into evidence. Michael Bentzen, a witness for the plaintiff, testified that to the best of his knowledge the NuDell Corporation had a contract with Almark whereby the Almark Corporation represented NuDell with the Federal Government. In addition, Almark received commissions only and did no direct purchasing from NuDell. This witness testified, however, that his knowledge concerning the NuDell contract had come from the defendant Rahm. The testimony of William M. Treadwell, another witness for the plaintiff, reveals that he purchased Almark Inc. from the defendant Rahm and was advised that the NuDell contract was not a part of the assets of Almark. Plaintiff's Exhibit 18 was identified by this witness which is an addendum to the contract referred to above in evidence as plaintiff's Exhibit 17. This agreement is between the plaintiff and the defendant whereby the business venture of the parties were divided and any receivables due Almark from NuDell were pledged.

The defendant testified that the contract with NuDell was no longer valid by virtue of its reference to a G.S.A. contract which had expired in 1973 and therefore the arrangement was verbal. He further testified, however, that the contract was valid through April 21, 1977 and NuDell took it over in October 1976. He further testified that he told Treadwell that the sale of Almark stock included whatever there was in Almark and that Treadwell attempted to continue the NuDell contract with G.S.A., but was unsuccessful. Thereafter, according to Rahm's testimony, NuDell asked him to finish off the contract.

The defendant also testified that his daughter formed a corporation with his assistance called Promark, Incorporated and that he began servicing the NuDell contract for Promark in March 1977 which was only one month after he had sold Almark to Treadwell. He also indicated he had been receiving compensation from Promark.

This testimony is contradictory in that the defendant testified on one hand there was no contract and yet on the other that there was a contract in existence until March 1977. Furthermore, he testified that Treadwell was to receive all of the assets of Almark which included the NuDell contract, yet Treadwell's testimony is clear that he was advised by the defendant Rahm that the NuDell contract was not part of the assets. In addition Rahm knew or should have known that this asset had been

pledged under the addendum to the agreement in evidence as plaintiff's Exhibit 17. These acts must be construed in the light of the defendant's financial position, his expertise in financial matters and his experience with prior bankruptcy proceedings. The only logical and proper conclusion is that the defendant caused this pledged asset to be transferred to the Promark Corporation at a time when his financial condition was critical, and such action coupled with the transfer of the assets to a corporation owned by his daughter from which he benefited must be construed to be a violation of Title 18 Section 152.

(b) The assertion here is as to a false oath under Title 18 Section 152 which is alleged to have been made at a Rule 205 Hearing on January 25, 1978.

Plaintiff Smith alleges that the defendant Rahm, in order to secure loans of money or extension on renewals of credit, did not include in certain financial statements substantial tax liabilities of three bankrupt shoe companies, for which taxes defendant was then personally liable. Smith asserts that Rahm was aware of the said tax liabilities and intentionally neglected to make known to his creditors the existence of the said liabilities.

This Court has ruled that Rahm is to be charged with the knowledge of the financial condition of the three bankrupt shoe companies. Testimony elicited from Rahm at the Rule 205 Hearing establishes that he became aware of the federal tax liability in the Fall of 1974. At that time, Rahm was President and Treasurer of the three shoe companies while his wife, Lotte Rahm, was Secretary. Rahm also knew that "the tax liabilities by these corporations i. e. the shoe companies were 941 payroll tax withholdings that were not paid, and he knew that eventually the Internal Revenue Service would assign one hundred percent penalties to the responsible directors and officers to collect from the proceeds of assets auctioned off." Rahm further stated that "if anything were left over to be paid, the Internal Revenue Service would begin proceedings to charge [him] personally with that tax liability."

Rahm acknowledged that when he prepared the December 1975 Planters Bank financial statement he knew "informally" that most of the assets of the three shoe companies had been liquidated.

With respect to the financial statement Rahm prepared for Services National Bank (January 6, 1975) [not admitted into evidence], questions were put to Rahm concerning certain contingent liabilities. Rahm did not place any contingent liabilities in the spaces so provided on the financial statement, although in the "assets" space, he did mark down a "possible asset" (a part interest in a residence in Germany). Plaintiff's counsel noted:

You (Rahm) explained that you did not include it (possible asset) in the total in terms of dollar figures, because you felt it wasn't a sure thing: so to speak, that this is an asset you could put in the dollar figures. Well, under the liabilities, this is essentially the explanation that you have given with respect to the taxes, too, yet you did not indicate anywhere in there that there was a potential of a tax liability.

Rahm replied that there were two other individuals who may have been subjected to an eventual assessment. Yet, he was aware that all "officers and directors collectively (would) be asked to pay off the remainder (of tax liability owed), or whatever the amount of that 941 tax liability (finally came to)." Further, Rahm himself minimized the importance of these individuals as officers in the shoe companies when he noted that they did not "carry as much responsibility or weight" as he did.

Having taken these factors into account in light of the ruling that Rahm is to be held knowledgeable of the financial condition of the three shoe companies, it is proper for this court to conclude that certain of Rahm's statements placed in the record of the Rule 205 Hearing were inaccurate, towit: (1) Rahm believed that "there were considerable assets" in the three shoe companies at the time he prepared several fi-

nancial statements; and (2) Rahm believed he "was not in a position to say with certainty that there was any tax liability." Rahm further admitted under oath:

> ". . . I was aware of the law that says that if that liability cannot be satisfied by corporate assets, then eventually all responsible officers and directors collectively will be asked to pay off the remainder, or whatever the amount that 941 tax liability is. . . ."

Bankruptcy Rule 205(a) provides that upon proper application the Court may order the examination of any person. Such a hearing was held on January 25, 1978. The defendant Rahm was administered the oath to testify truthfully as to questions put to him by plaintiff's counsel. The Court must conclude that Rahm's testimony is such as to conclusively prove the accuracy of the allegations made in paragraph 8(b) of Count One of the complaint.

The allegations of Count Two seek exception to discharge for plaintiff's claim under Section 17 based on the same evidentiary and factual situation.

The allegation of paragraph 13 was dismissed at the conclusion of the plaintiff's case for reasons set forth in the record.

The rulings for the allegations of Count One are fully dispositive of the additional allegations of Count Two and need no further discussion. The allegation of Count Three which involves security violations were dismissed at the conclusion of the evidence for the reasons set forth in the record and the additionally assigned reasons set forth below.

The reasons for such dismissal are based on plaintiff's inability to establish a prima facie case under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.-10b–5 or Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a).

The principal antifraud provision of the Securities Exchange Act of 1934 is Section 10(b). This section applies to both the sale and purchase of securities. The section is not self-implementing and therefore, the Securities and Exchange Commission has promulgated Rule 10b–5. The application of this rule prohibits on a broad basis fraudulent practices in general, but specifies three general areas of proscribed activities: (1) the employment of any device, scheme, or artifice to defraud; (2) the making of any untrue statement or the omission of any statement of material fact; or (3) the engaging in any act, practice, or course of business which does or would operate as fraud or deceit.

It will be helpful to discern those actions which the plaintiff alleges the defendant committed alone or in concert with others which require relief under said rule in the light of the criteria set forth above. While plaintiff incorporates and reiterates other substantive portions of his complaint into Count Three, the only area which requires further consideration by the Court is the circumstances surrounding the acquisition of Virginia Wire Manufacturing Company.

The first and principal issue to be resolved is whether Smith can establish the requisite standing under the *"Birnbaum"* Rule first enunciated in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952). The District Court for the Southern District of New York explained:

> That the *"Birnbaum* Rule" contains two proscriptions:
>
> (1) that the fraud be of the type that is usually associated with the purchase or sale of securities, and,
>
> (2) that the protection of Rule 10b–5 is extended only to the defrauded purchaser or seller.

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 353 F.Supp. 264 (S.D.N.Y.1972).

The Supreme Court upheld that *"Birnbaum"* Rule in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), by finding that a nonpurchaser does not have standing under Section 10(b) of the Securities Exchange Act of 1934.

Plaintiff also seeks to establish standing under Section 17(a) of the Securities Act of

1933. The District Court for the Eastern District of Virginia addressed this issue in *Reid v. Madison*, 438 F.Supp. 332 (E.D.Va. 1977). The Court recognized that the question of non-purchaser standing under Section 17(a) of the 1933 Act had not directly been resolved in either the Fourth Circuit or The Supreme Court. Relying on dicta in *Blue Chip Stamps*, the *Reid* Court held that that case opened "the door for non-purchaser standing under 317(a) of the 1933 Act", id. at 335.

■ It should be noted that the 1933 Act applies only to the sale of, or an offer to sell, securities, not to their purchase. In *Blue Chip Stamps*, Exchange Act and Section 17(a) of the Securities Act, stating:

> The wording of § 10(b) directed at fraud "in connection with the purchase or sale" of securities stands in contrast with the parallel antifraud provision of the 1933 Act, § 17(a), . . . reaching fraud "in the offer or sale" of securities . . . When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly. 421 U.S. 723, 733–34, 95 S.Ct. 1917, 1924–1925, 44 L.Ed.2d 539 (Citations omitted).

As indicated below the disputed facts in the instant matter concern plaintiff's alleged purchase of Virginia Wire and the attendant fraud "in connection with the purchase" of said company, rather than sale of or an offer to sell securities.

The testimony reveals that in early 1976 Rahm sought to acquire Virginia Wire for himself, Smith and Smira Corporation, which was their holding company. Smith did not express an initial interest for Smira to purchase Virginia Wire. Rahm discussed the purchase of Virginia Wire with Ronnie Hold, the owner of said company. Together with Maurice Painter and Hold, Rahm prepared the February 29, 1976 income statement of Virginia Wire, admitted into evidence as plaintiff's Exhibit 19. This statement listed the assets, liabilities and equity of Virginia Wire.

Rahm testified that Smith was concerned, so it was decided among he, Smith and Bentzen, the directors of Smira, to secure the services of Bissell and Associates, an accounting firm. Bissell was directed "to verify the figures and (make) as many checks as possible" on Virginia Wire. An investigation by Bissell resulted in the March 25, 1976 report by Mitchell Gorochon (defendant's Exhibit B). Rahm further testified that "this report was more than anything else the basis for proceeding to finalize the deal."

On the strength of the assets and real estate holdings of Virginia Wire, the Planters Bank of Bridgewater, Virginia agreed to extend a loan upon which Rahm gave a personal guarantee for the indebtedness of Virginia Wire in which he was an officer. At this time neither Planters Bank nor Rahm requested Smith to endorse this indebtedness. Subsequently, Smith, Rahm and Bentzen agreed that Virginia Wire should become a part of Smira Corporation.

Smith's ownership interest in Smira was in the form of a revocable trust with his children as beneficiaries. It was not until sometime later that he revoked the trust fund and transferred the Smira stock to his own name.

The October 6, 1976 agreement entered into by Smith and Rahm, plaintiff's Exhibit 16, resulted in a division of the assets of Smira Corporation between them. Smith's own testimony reveals that Almark and NORS were insolvent. BTU had only minimal assets, and was conducting little if any business. It was decided that Smith would receive Virginia Wire. Rahm would take over BTU, Almark and NORS.

■ Smith has failed to establish that he was a purchaser of Virginia Wire prior to the October 6th agreement. Furthermore there is no evidence to suggest that he was the victim of a device, scheme or artifice in connection with the purchase (in the instant matter, a division of assets) of Virginia Wire as alleged in the Complaint. On the contrary, the evidence in the record supports the view, by Smith's own testimony, that he was given "the company with the smallest amount of problems." Virginia

Wire was the company with the most assets.

Plaintiff raises two additional issues which require only summary examination, whether: (1) the February 29, 1976 income stated constituted a wilful and knowingly inaccurate assessment of the financial status of Virginia Wire; and (2) the failure by Rahm to inform Smith of the business and intra family relationship between Eastern Steel and Virginia Wire constituted a material fact that worked a fraud on Smith in violation of Section 10(b) and Rule 10b–5.

Rahm testified that the February 29 income statement was based on figures supplied by Hold which he sought to verify by a personal inspection of the plant site. It was later jointly agreed by Rahm, Smith and Bentzen to secure the services of Bissell and Associates to investigate Virginia Wire which was to prepare a report based on said investigation. Smith had access to this report and was kept apprised of the on-site investigation of Bissell. In light of these facts the Court cannot find that Rahm was in a clearly superior position to know crucial material information that Smith was unable to learn of by way of independent investigation. Smith has failed to demonstrate satisfactorily that Rahm possessed the requisite intent to deceive, manipulate or defraud Smith in the preparation and presentation of the February 29 income statement.

There is also to be considered that evidence introduced by Rahm which places in doubt Smith's allegations of Virginia Wire's consistently poor financial condition. Bentzen, acting as Smith's attorney and trustee of one hundred percent of Virginia Wire's stock, wrote a letter to Richard Moore, President of Ohio Wire Products. (Defendant's Exhibit E). This letter, dated March 10, 1977, principally concerned an inquiry as to whether Moore was interested in purchasing Virginia Wire. Bentzen represented in said letter that Virginia Wire at that time was operating at a profit, and theoretically, could have continued to do so.

Lastly, Smith alleges that he was not informed by Rahm that Virginia Wire purchased wire from Eastern Steel at an allegedly wholesale price, nor of the family ownership ties between Eastern Steel and Virginia Wire, Smith testified that this was "a critical piece of information that was never disclosed to (him)."

In order for there to be a violation of the Securities Exchange Act by a manipulative or deceptive device the misrepresentation or even innocent nondisclosure must be material. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Materiality is to be viewed by an objective rather than a subjective standard. *In re Home-Stake Production Company Securities Litigation*, 76 F.R.D. 351 (N.D.Okl.1977). Thus, the basic test for determining the materiality of a misrepresentation or omission is whether a reasonable and prudent investor would attach importance to facts omitted or misrepresented in determining his choice of action in the transaction in question. *Securities & Exchange Commission v. American Realty Trust*, 429 F.Supp. 1148, 1170 (E.D. Va.1977) *reversed on other grounds*, 586 F.2d 1001 (4th Cir. 1978).

It has been held that the materiality of an alleged misrepresentation is an essential element to recovery in an action brought under Section 10(b) and Rule 10b–5. *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir. 1976). Determining whether a particular fact is material within the meaning of Section 10(b) and Rule 10b–5 clearly cannot be made in a vacuum, however. Each case must be viewed as a discreet set of circumstances and judged on its own unique facts. *Securities & Exchange Commission v. Bausch & Lomb*, 420 F.Supp. 1226 (S.D.N.Y.1976).

With respect to Eastern Steel's relationship to Virginia Wire, Rahm testified that the former belonged to Hold's father, and that that company supplied Virginia Wire with wire. Testimony received at trial, with reference to the March 25, 1976 Bissell report submitted by Mitchell Gorochon, revealed that the cost of wire was contingent upon the quantity purchased.

Various trade journals examined by Gorochon revealed that wire purchased by Virginia Wire from Eastern Steel was competitively priced with wire available from other sources. On the basis that Virginia Wire's payments to Eastern Steel were competitive with prices quoted in trade journals, the Court cannot find that Rahm's omission was a material factor which would cause a reasonable and prudent investor to attach great importance to such an omission.

After having carefully examined the record the Court must conclude that Rahm did not possess the requisite intent to deprive, manipulate, or defraud Smith under the anti-fraud provisions of the Securities and Exchange Act of 1934, Securities and Exchange Commission Rule 10b–5, or the Securities Act of 1933.

As indicated, the defendant having given a false financial statement to Planters Bank while an officer of a corporation and having transferred property as well as made false oath in violation of Title 18 Section 152, his discharge will be denied pursuant to the provisions of Section 14 of the Bankruptcy Act.